Jeffrey W. GAZAWAY, Plaintiff,

v.

MAKITA U.S.A., INC., Defendant.

No. 97–2287–JWL.

United States District Court,
D. Kansas.

June 5, 1998.

Denise M. Anderson, Anderson Platts Law Firm, Kansas City, MO, for Plaintiff.

Jeffrey W. Gazaway, Shawnee, KS, pro se.

Joyce R. Rosenberg, Spencer, Fane, Britt & Browne, Mark P. Johnson, Rowdy B. Meeks, Sonnenschein, Nath & Rosenthal, Kansas City, MO, for Defendant.

## *MEMORANDUM AND ORDER*

LUNGSTRUM, District Judge.

Plaintiff Jeffrey W. Gazaway filed suit against Makita U.S.A., Inc. alleging violations of the Americans with Disabilities Act and the Kansas Act Against Discrimination as well as a claim of outrage. This matter is presently before the court on Makita's motion for summary judgment (doc. # 54). As set forth in more detail below, Makita's motion for summary judgment is granted.

### I. Facts [1]

This case is set in an extremely sad factual context. Plaintiff Jeffrey W. Gazaway

---

1. In accordance with the applicable summary judgment standard, the facts are uncontroverted or related in the light most favorable to plaintiff.

worked as a sales representative for Makita from November 1995 until August 1996, when Makita reduced its workforce. As a sales representative, Mr. Gazaway was responsible for selling and demonstrating Makita products in Makita's Western Missouri sales territory. Mr. Gazaway called on both distributors and retail accounts and, often, traveled throughout his sales territory in a company van.

On May 8, 1996, while driving a company van, Mr. Gazaway was involved in a fatal accident. A small child ran out onto the highway in front of Mr. Gazaway's van and was killed. Mr. Gazaway was cleared of any fault or liability in connection with the accident. Later that evening, Mr. Gazaway asked his brother to notify Steve Buscher, Mr. Gazaway's supervisor, about the accident and to inform him that Mr. Gazaway would not be reporting for work the following day because he was so upset. Mr. Buscher assured Mr. Gazaway's brother that it was fine for Mr. Gazaway to remain home from work the following day and that he would notify the appropriate individuals about the accident.

Jim Buck, Makita's Regional Vice President, telephoned Mr. Gazaway on the day after the accident. During this conversation, Mr. Buck told Mr. Gazaway that he understood that Mr. Gazaway was very upset and he felt sorry for him.[2] Mr. Buck agreed with Mr. Gazaway that the accident was devastating and that anyone would have difficulty dealing with it. He also informed Mr. Gazaway about Makita's employee assistance program and encouraged Mr. Gazaway to seek counseling through the program if necessary.

After some discussion, Mr. Buck and Mr. Gazaway agreed that Mr. Gazaway would return to work the following Monday with the understanding that Mr. Gazaway "would try and do the best he could." On Monday, Mr. Buck told him to fly to Chicago, pick up a new van, and drive the van back to Kansas City for use in connection with his sales work.[3] Although Mr. Gazaway reluctantly went to Chicago, he told Mr. Buck that he was "scared to death" to drive and that he had not driven since the accident. When Mr.

Gazaway arrived in Chicago, he again told Mr. Buck that he was afraid of driving, but agreed to drive the van back to Kansas City and "do the best he could."

For approximately the next three weeks, Mr. Gazaway used the van he had picked up in Chicago to call on customers and otherwise service his sales territory. When the van he had been driving at the time of the accident was finally repaired, however, Mr. Buck instructed Mr. Gazaway to pick up the repaired van and begin driving it instead of the van from Chicago. Mr. Gazaway told Mr. Buck that he was worried that driving the repaired van would bring back horrible memories of the accident. Despite Mr. Gazaway's pleas, Mr. Buck insisted that he begin driving the van that he had been driving at the time of the accident. Mr. Gazaway drove this van throughout the remainder of his employment with Makita.

Mr. Gazaway continued to work as a sales representative for Makita throughout the summer of 1996. During this time, he was able to perform his job duties, including driving, calling on customers, and selling and demonstrating Makita products. In this same time frame, Mr. Gazaway began visiting with a psychologist on a periodic basis with respect to the May 1996 accident and its effects on Mr. Gazaway's emotional well-being. In July 1996, he began taking prescription medication for depression and was eventually diagnosed with post-traumatic stress disorder.

In December 1995, Makita began a process of restructuring and reorganizing its business. In connection with the restructuring, Makita laid off approximately sixty-six sales representatives and hired additional retail service representatives. Sales representatives are primarily responsible for selling and placing Makita products. Retail service representatives, on the other hand, are responsible for servicing home center stores (e.g., Home Depot, Home Quarters, Sears) by setting displays, demonstrating products, and educating home center employees about Makita products.

---

2. Mr. Gazaway was crying during the conversation with Mr. Buck.

3. The van Mr. Gazaway was driving at the time of the accident was undergoing repairs.

In August 1996, as part of the restructuring effort, Makita consolidated its Western Missouri and Eastern Kansas sales territories. As a result of this consolidation, Makita determined that it needed to lay off either Jack Haynes, the sales representative responsible for Makita's Eastern Kansas sales territory, or Mr. Gazaway, who was responsible for the Western Missouri territory. Makita selected Mr. Gazaway for layoff because he had less seniority than Mr. Haynes and because Mr. Gazaway had been "struggling to make his number."

Shortly after his layoff, Mr. Gazaway secured a sales position with another company and has been working in sales continuously ever since that time.

## II. Summary Judgment Standard

When considering a motion for summary judgment, the court must examine all of the evidence in the light most favorable to the nonmoving party. *Jones v. Unisys Corp.*, 54 F.3d 624, 628 (10th Cir.1995). A moving party that also bears the burden of proof at trial is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 536 (10th Cir.1995). If the moving party does not bear the burden of proof at trial, it must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the movant meets these requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmovant may not merely rest on the pleadings to meet this burden. *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505. Summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548(quoting Fed.R.Civ.P. 1).

## III. Disability Discrimination [4]

■ Mr. Gazaway alleges that Makita discriminated against him on the basis of both an actual disability and a perceived disability (*i.e.*, post-traumatic stress disorder). As set forth in more detail below, the court concludes that Mr. Gazaway does not have a "disability" within the meaning of the ADA and, accordingly, grants Makita's motion for summary judgment on Mr. Gazaway's disability discrimination claim.[5]

The ADA prohibits a covered entity from discriminating against a "qualified individual with a disability" because of the individual's disability with respect to terms, conditions, and privileges of employment. *See* 42 U.S.C. § 12112(a). The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *Sutton v. United Air Lines, Inc.*,

---

**4.** Makita argues that Mr. Gazaway has failed to exhaust his administrative remedies with respect to his KAAD claim. Because Mr. Gazaway fails to address this argument in his papers, he apparently concedes that he has not adequately exhausted his remedies with respect to this claim. Thus, the court grants Makita's motion for summary judgment on Mr. Gazaway's KAAD claim. *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1409 (10th Cir.1997) (a plaintiff must exhaust his or her administrative remedies under the KAAD before seeking judicial relief) (citing *Van Scoyk v. St. Mary's Assumption Parochial Sch.*, 224 Kan. 304, 306, 580 P.2d 1315 (1978)).

In any event, the court would apply the same standards and burdens to Mr. Gazaway's KAAD claim as applied to his ADA claim. *See id.* at 1403 n. 3 (applying same standards and burdens to plaintiff's ADA claims and KAAD claims) (citing *Woods v. Midwest Conveyor Co.*, 231 Kan. 763, 767, 648 P.2d 234 (1982)). Thus, Makita would be entitled to summary judgment on Mr. Gazaway's KAAD claim even if he had exhausted his administrative remedies.

**5.** Although it is unclear from his papers, Mr. Gazaway may also be claiming that Makita violated the ADA by refusing to accommodate his alleged disability. To the extent he is asserting a claim based on a "failure to accommodate" theory, summary judgment is similarly appropriate in favor of Makita because the court concludes that Mr. Gazaway does not have a "disability" within the meaning of the ADA.

130 F.3d 893, 897 (10th Cir.1997); *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1123 (10th Cir. 1995) (quoting *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir.1995) (quoting 42 U.S.C. § 12111(8))).

Thus, to establish a claim under the ADA, Mr. Gazaway must demonstrate that: (1) he is disabled within the meaning of the ADA; (2) he is qualified, that is, with or without reasonable accommodation (which he must describe), he is able to perform the essential functions of the job; and (3) Makita terminated his employment because of his disability. *See Sutton*, 130 F.3d at 897 (citing *Siemon v. AT&T Corp.*, 117 F.3d 1173, 1175 (10th Cir.1997); *White*, 45 F.3d at 360–61; *MacDonald v. Delta Air Lines, Inc.*, 94 F.3d 1437, 1443 (10th Cir.1996). As set forth below, Mr. Gazaway has not produced sufficient evidence with respect to the first element of his prima facie case.

### A. The "Disabled" Requirement

Under the ADA, a "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2); *Sutton*, 130 F.3d at 897 (quoting 42 U.S.C. § 12102(2)). Mr. Gazaway relies upon subsections (A) and (C) of § 12102(2) in an effort to establish that he is disabled under the ADA. Specifically, he alleges that his post-traumatic stress disorder substantially limited his ability to work. Alternatively, Mr. Gazaway maintains that Makita regarded him as having a disability. The court will address each of Mr. Gazaway's arguments in turn.

### 1. Actual Disability

As set forth above, Mr. Gazaway alleges that Makita discriminated against him on the basis of an actual disability—his post-traumatic stress disorder. To avail himself of the benefits of the ADA under this theory, Mr. Gazaway must demonstrate that his impairment "substantially limits one or more of [his] major life activities." *See* 42 U.S.C. § 12102(2)(A).[6]

The ADA does not define either "substantially limits" or "major life activity." According to the regulations implementing the ADA, "major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Sutton v. United Air Lines, Inc.*, 130 F.3d 893, 900 (10th Cir.1997) (quoting 29 C.F.R. § 1630.2(i)). *See also MacDonald v. Delta Air Lines, Inc.*, 94 F.3d 1437, 1444 (10th Cir.1996) (adopting definition in 29 C.F.R. § 1630.2(i)). Other activities such as sitting, standing, lifting and reaching may be considered "major life activities." *Lowe v. Angelo's Italian Foods, Inc.*, 87 F.3d 1170, 1173 (10th Cir.1996) (citing 29 C.F.R. § 1630.2(i)). In order for an impairment to be considered "substantially limiting," the individual must be

 (i) unable to perform a major life activity that the average person in the general population can perform; or

 (ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

*Sutton*, 130 F.3d at 900 (quoting 29 C.F.R. § 1630.2(j)(1)).

According to Mr. Gazaway, his post-traumatic stress disorder substantially limited his ability to work.[7] To demonstrate that

---

**6.** Makita does not dispute that Mr. Gazaway's condition constitutes a "mental impairment" within the meaning of the ADA. *See* 29 C.F.R. § 1630.2(h)(2) (defining "mental impairment"); *Sutton v. United Air Lines, Inc.*, 130 F.3d 893, 898–99 (10th Cir.1997) (discussing same).

**7.** It appears from the record that Mr. Gazaway is currently taking the appropriate medication for his condition and, thus, no longer considers himself "substantially limited" in his ability to work.

Although Makita has not raised the issue, and therefore the court will not address it, Mr. Gazaway's apparent recovery cuts against his claim that he has a "disability" within the meaning of the ADA. *See Bolton v. Scrivner, Inc.*, 36 F.3d 939, 943 (10th Cir.1994) (factors to consider in analyzing whether an individual has a "disability" under the ADA include the duration of the impairment and the permanent or long-term impact of the impairment) (citing 29 C.F.R. § 1630.2(j)(2)). *See also Matthews v. Common-*

an impairment substantially limits the major life activity of working, an individual must show a significant restriction in the "ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Bolton v. Scrivner, Inc.,* 36 F.3d 939, 942 (10th Cir. 1994) (quoting 29 C.F.R. § 1630.2(j)(3)(i)). In determining whether Mr. Gazaway was significantly restricted in his ability to perform either a class of jobs or a broad range of jobs, the court considers:

(A) [t]he geographical area to which the individual has reasonable access;

(B) [t]he job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or

(C) the job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

*Id.* at 943 (quoting 29 C.F.R. § 1630.2(j)(3)(ii)).

■ Significantly, Mr. Gazaway admits that, after the accident, he was able to fully perform the essential functions of his job, including driving, calling on customers, and demonstrating and selling products. Moreover, Mr. Gazaway secured another sales position less than three weeks after his layoff and has been working in sales continuously since that time. The essence of Mr. Gazaway's claim is that his condition substantially limited his "competitive edge"—a crucial characteristic of a successful salesperson— and, thus, he was unable to generate the revenues *required by Makita.* It is well settled, however, that the "inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *See, e.g., Sutton,* 130

F.3d at 904 (quoting 29 C.F.R. § 1630.2(j)(3)(i)).

Moreover, Mr. Gazaway has not submitted sufficient evidence for a reasonable factfinder to conclude that his post-traumatic stress disorder significantly restricted his ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. Although he opined in an affidavit that his diminished "competitive edge" significantly restricted his ability to perform a class of jobs or a broad range of jobs in various classes, this purely conclusory statement provides no basis for the court to conclude that Mr. Gazaway was substantially limited in his ability to work. *See Nolan v. Sunshine Biscuits, Inc.,* 917 F.Supp. 753, 758 (D.Kan.1996). Significantly, Mr. Gazaway has offered no evidence with respect to the number or types of other sales positions in the geographical area to which he had access that would be as demanding as his position at Makita in terms of required revenues or other standards. Similarly, there is no evidence in the record with respect to the number or types of other sales positions which would require the kind of "aggressive" or "active" selling required by Makita. In fact, Mr. Gazaway testified that his new sales position required him only to "maintain established business relationships" rather than "actively" attempt to sell more products to customers.

■ In light of plaintiff's testimony with respect to his ability to perform his job duties, and in the absence of competent evidence suggesting that his diminished "competitive edge" significantly restricted his ability to perform a class of jobs or a broad range of jobs in various classes, the court concludes that plaintiff has not sufficiently shown that his condition substantially limited his ability to work. *See, e.g., Bolton v. Scrivner, Inc.,* 36 F.3d 939, 944 (10th Cir.1994) (plaintiff failed to show significant restriction in ability to perform either a class of jobs or a broad range of jobs in various classes where the evidence did not address his voca-

*wealth Edison Co.,* 128 F.3d 1194, 1198 (7th Cir.1997) (questioning disability status under ADA where plaintiff, by the time of oral argu-

ment, had recovered fully and was working full-time for another employer in a job similar to the one from which he was discharged).

tional training, the geographical area to which he had access, or the number and type of jobs demanding similar training from which he would also be disqualified); *Welsh v. City of Tulsa*, 977 F.2d 1415, 1419 (10th Cir.1992) (plaintiff disqualified from firefighter position based on decreased sensation in fingers failed to show substantial limitation in ability to work where he only speculated that he would be similarly disqualified from other fire departments and he failed to show that he was qualified solely for a firefighter position) (Rehabilitation Act). Thus, Mr. Gazaway does not have a "disability" within the meaning of subsection (A) of § 12102(2) and the court grants Makita's motion for summary judgment with respect to Mr. Gazaway's discrimination claim to the extent his claim is based on an actual disability.[8]

### 2. "Regarded As" Disabled

■ Mr. Gazaway also contends that Makita "regarded" him as having a disability, *see* 42 U.S.C. § 12102(2)(C), primarily because Jim Buck encouraged him to seek psychological counseling through Makita's employee assistance program. The regulations implementing the ADA explain that a person is "regarded as" having an impairment that substantially limits a major life activity if he

(1) has a physical or mental impairment that does not substantially limit major life activities but *is treated* ... as constituting such limitation;

(2) has a physical or mental impairment that substantially limits major life activi-

ties only *as a result of the attitudes* of others toward such impairment; or

(3) has none of the impairments defined [in the regulations] but is treated ... as having a substantially limiting impairment. *MacDonald v. Delta Air Lines, Inc.*, 94 F.3d 1437, 1444 (10th Cir.1996) (quoting and adopting 29 C.F.R. § 1630.2(1)(1)-(3)). *See also Sutton v. United Air Lines, Inc.*, 130 F.3d 893, 903 (10th Cir.1997) (same). Thus, "'a person is "regarded as having" an impairment that substantially limits the person's major life activities when other people treat the person as having a substantially limiting impairment,' regardless of whether the individual actually has an impairment." *Sutton*, 130 F.3d. at 903 (quoting *MacDonald*, 94 F.3d at 1444 (quoting *Wooten v. Farmland Foods*, 58 F.3d 382, 385 (8th Cir. 1995))). In essence, the "focus is on the impairment's or the perceived impairment's effect upon the attitudes of others." *Id.*

Construing the facts in a light most favorable to Mr. Gazaway, the court concludes that he has not produced evidence from which a reasonable factfinder could conclude that Makita regarded his condition as substantially limiting any of his major life activities. In fact, Mr. Gazaway does not even suggest that Makita or, in particular, Jim Buck regarded his condition as substantially limiting any of his major life activities. The court assumes that Mr. Gazaway is claiming that Makita regarded his condition as substantially limiting his ability to work. In order to establish a "disability" under the

---

8. Approximately two weeks after Mr. Gazaway filed his opposition to Makita's motion for summary judgment, and one week after Makita filed its reply brief, Mr. Gazaway filed several "supplemental exhibits" to his opposition brief. These exhibits consist primarily of medical records and expert reports concerning Mr. Gazaway's post-traumatic stress disorder and, the court assumes, were offered in an effort to demonstrate that Mr. Gazaway has a "disability" within the meaning of the ADA. Mr. Gazaway did not seek leave of court prior to filing these supplemental exhibits and offers no explanation of whether or how these exhibits are relevant to his opposition papers. Makita then filed a motion to strike these supplemental exhibits (doc. # 78) as untimely and because the exhibits constitute inadmissible hearsay. The court grants Makita's motion to strike. A review of the supplemental exhibits reveals that these materials were in the

possession of Mr. Gazaway at the time he filed his opposition papers. Moreover, as Makita suggests, Mr. Gazaway has failed to verify the documents through a supporting affidavit from a records custodian, health care provider, or anyone else with personal knowledge of the facts contained in the exhibits. *See* Fed.R.Civ.P. 56(c) & (e); D. Kan. Rule 56.1.

Having reviewed the exhibits in connection with Makita's motion to strike, however, the court concludes that even if it considered the additional materials supplied by Mr. Gazaway, it would nonetheless grant Makita's motion for summary judgment. Specifically, the proffered medical records and expert reports do not shed any light on Mr. Gazaway's ability to work in a class of jobs or a broad range of jobs, nor do they suggest that Mr. Gazaway is substantially limited in any other major life activity.

"regarded as" prong of the ADA with respect to the major life activity of working, Mr. Gazaway must establish that Makita regarded him as substantially limited in his ability to perform either a class of jobs or a broad range of jobs. *Sutton*, 130 F.3d at 904; *MacDonald*, 94 F.3d at 1445. He cannot make this showing.

In his papers, Mr. Gazaway sets forth two reasons for his belief that Makita regarded him as having a disability: (1) Mr. Buck encouraged him to seek counseling through Makita's EAP program; and (2) Mr. Buck, by insisting that Mr. Gazaway continue working, essentially instructed him to "pretend as if nothing had happened." Viewing the evidence in the light most favorable to Mr. Gazaway, the fact that Mr. Buck encouraged him to seek counseling—on the day after the accident—establishes only that Mr. Buck was sympathetic to the devastating experience Mr. Gazaway had just suffered. Similarly, Mr. Buck's insistence that Mr. Gazaway continue working after the accident falls far short of establishing (and Mr. Gazaway does not even allege) that he "regarded" Mr. Gazaway as substantially limited in his ability to perform a class of jobs or a broad range of jobs. In fact, this evidence indicates that Mr. Buck regarded Mr. Gazaway as fully capable of performing his duties as a sales

representative for Makita *despite* any condition he may have had. *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1412–13 (10th Cir.1997) (upholding summary judgment for employer on plaintiff's disability discrimination claim in part because plaintiff "repeatedly argued" and presented evidence that the employer considered him able to perform his duties). In short, Mr. Gazaway has failed to set forth evidence establishing that he was disabled under the "regarded as" definition found at § 12102(2)(C). Thus, Makita's motion for summary judgment is granted with respect to this claim.

### B. *The Pretext Analysis*

■ Even if Mr. Gazaway had set forth sufficient evidence with respect to his prima facie case, the court would nonetheless grant Makita's motion for summary judgment because Mr. Gazaway has failed to raise any inference of pretext.[9] Makita has offered a legitimate, nondiscriminatory reason for its decision to layoff Mr. Gazaway—a reduction in force. According to Makita, Mr. Gazaway was selected for layoff during the reduction in force because he had less seniority than Jack Haynes, the sales representative in Eastern Kansas.[10] In an effort to refute Makita's explanation, Mr. Gazaway highlights three points: (1) Makita had no intention to

---

9. Mr. Gazaway believes that Jim Buck's suggestion that he seek counseling and insistence that he continue working despite the accident constitute direct evidence of discrimination. Such evidence does not rise to the level of direct evidence of discrimination needed to set aside the *McDonnell Douglas* mode of inquiry. According to established Tenth Circuit precedent, a "plaintiff proves discrimination by direct evidence when she presents proof of 'an existing policy which itself constitutes discrimination,'" *see Mosley v. Pena*, 100 F.3d 1515, 1519 (10th Cir.1996) (quoting *Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472, 1477 (10th Cir.1996) (quoting *Ramsey v. City & County of Denver*, 907 F.2d 1004, 1008 (10th Cir.1990))); *York v. AT & T Co.*, 95 F.3d 948, 953–54 (10th Cir.1996) (noting that where the Supreme Court has considered the *McDonnell Douglas* test inapplicable, "the employer's policy has been 'discriminatory on its face,' treating the members of the disadvantaged group differently according to the very terms of their employment."), or when she presents proof that the employer actually relied on a protected characteristic in making its employment decision (*i.e.*, statement by decisionmaker during decisional process showing discriminatory animus), *see*

*Ramsey*, 907 F.2d at 1008 (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)).

Moreover, as set forth in more detail in this opinion, the court does not even consider this circumstantial evidence of discrimination. In other words, this evidence is insufficient to permit a reasonable factfinder to draw an inference of discriminatory intent.

10. The parties vigorously dispute whether Makita had sufficient knowledge of Mr. Gazaway's alleged disability to be held liable under the ADA. Makita suggests that actual knowledge of an employee's diagnosis is required. Mr. Gazaway, on the other hand, suggests that knowledge of the symptoms underlying a disability is sufficient to put an employer on notice of a potential disability. In light of the court's disposition on Mr. Gazaway's ADA claim, the court will assume without deciding that Makita had sufficient knowledge of Mr. Gazaway's disability. The court expresses no opinion on the requisite degree of knowledge an employer must have with respect to an employee's alleged disability before it can be subject to liability under the ADA.

layoff Mr. Gazaway until August 1996 even though the restructuring effort began months earlier; (2) an internal Makita memorandum indicates that Mr. Gazaway's decline in performance was also considered in the selection process; and (3) Keith Delles, a Makita representative in Mr. Gazaway's territory with less seniority than Mr. Gazaway, was retained during the reduction in force.[11]

These points fail to cast doubt on Makita's legitimate, nondiscriminatory reason for selecting Mr. Gazaway for layoff. The fact that Makita did not decide to consolidate the Eastern Kansas and Western Missouri territories (and, thus, terminate Mr. Gazaway) until several months after the restructuring effort began does nothing to show that its reasons for selecting Mr. Gazaway for layoff during the reduction in force are pretextual. It is undisputed that Makita was reducing the number of sales representatives in its workforce and that the restructuring effort began in late 1995 or early 1996. In such circumstances, it is reasonable that a downsizing effort may take several months to complete. Although Mr. Gazaway is correct that the decision to consolidate his territory with Eastern Kansas was made after his May 1996 accident and subsequent emotional condition, the decision was made in the context of a legitimate reduction in force that had started several months prior to Mr. Gazaway's accident. Thus, the timing of the termination decision alone does not indicate that Makita's proffered reason for terminating Mr. Gazaway were pretextual. *Cf. Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir.1997) (three-month period between plaintiff's protected activity and her termination, standing alone, does not demonstrate a causal connection).

 The memorandum relied upon by Mr. Gazaway states that Mr. Gazaway was selected for layoff during the reduction in force because he "has less seniority than Jack Hayes [sic] and has also been struggling to make his number." According to Mr. Gazaway, his performance problems were caused by his post-traumatic stress disorder. Thus, according to Mr. Gazaway, Makita's decision to terminate him for performance reasons gives rise to an inference that Makita terminated him on the basis of his alleged disability. As set forth below, the court disagrees.

Although the Tenth Circuit has not had the opportunity to analyze an ADA claim in the reduction-in-force context, the Seventh Circuit has directly addressed the issue before the court today (*i.e.,* "whether an employer can ever be said to have fired a disabled worker on grounds of disability when he fired him because of a condition positively correlated with a disability."). *See Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1195 (7th Cir.1997).

In *Matthews*, the company underwent a reduction in force in the summer of 1992 and decided to use performance as the basis for retention decisions. *Id.* at 1197. Performance ratings were based on both the quality and quantity of work performed. *Id.* The plaintiff had suffered a severe heart attack in mid-1991 and was on medical leave for the remainder of the year. *Id.* The quantity of work the plaintiff had performed that year was therefore only about half the normal amount. *Id.* As a result, he received a low performance rating and was selected for layoff. *Id.*

The plaintiff filed suit under the ADA claiming that if he had not been disabled from working full-time as a result of his heart attack, he would not have received a low performance rating for 1991 and, thus, he probably would not have been laid off. *Id.* Affirming the district court's grant of summary judgment for the employer, Judge Posner emphasized that "there is no evidence that the company laid him off because he was disabled, rather than because of the stated

---

11. Mr. Gazaway makes a passing effort to challenge the necessity or the legitimacy of Makita's decision to reduce its workforce. In support of his argument, Mr. Gazaway suggests only that Makita failed to offer credible, admissible evidence supporting its RIF decision such as "budgets projecting significant losses." The court is not persuaded. Makita offered sufficient, competent evidence of its RIF decision through the

deposition testimony of Jim Buck. Moreover, Mr. Gazaway offers no evidence suggesting that Makita's decision to reduce its workforce was a pretext for illegal discrimination. In such circumstances, the Tenth Circuit has recognized that a RIF is a business decision and "the wisdom of a RIF is not for a court or jury to decide." *Doan v. Seagate Technology, Inc.*, 82 F.3d 974, 977 (10th Cir.1996).

reasons that he had contributed little in 1991." *Id.* Judge Posner continued:

> He was not discharged because of his disability. He was discharged because of a *consequence* of the disability—his absence from work the last half of 1991 and his not working full-time the following year. It may have been foolish for Commonwealth Edison to base its retention decisions on what workers had done in the past rather than on what they were likely to do in the future; Matthews' lawyer told us at argument that his client has now recovered fully and is working full-time for another employer in a job similar to the one he held at Commonwealth Edison before his heart attack. (That is why we expressed doubt whether he really is disabled within the meaning of the Americans with Disabilities Act; but this doubt plays no role in our decision.) We do not say that it was foolish. The company had painful choices to make and rewarding the people who had done or were doing the most work may have been a sensible criterion from the standpoint of maintaining good relations with, or motivating, its remaining employees. But foolish or not, it was not actionable under the ADA because it was not based on disability, although it was correlated with it.

*Id.* at 1198.

The court finds the reasoning of *Matthews* persuasive. In reaching its decision, the Seventh Circuit reiterated that the ADA prohibits discrimination against a "qualified" individual because of the individual's disability:

> An individual who cannot perform the essential functions of the job even with a reasonable accommodation to his disability by the employer is not "qualified," so the Act does not even come into play. It is irrelevant that the lack of qualification is due entirely to a disability.

*Id.* at 1195. Indeed, the Tenth Circuit has implicitly recognized this principle. *See Milton v. Scrivner, Inc.,* 53 F.3d 1118, 1124 (10th Cir.1995) (affirming summary judgment for employer where employee was discharged based on his inability to meet new production standards even though employee's inability to meet standards was a result of his alleged physical disability). Similarly, the Tenth Circuit has acknowledged an employer's right to make retention decisions during a reduction in force based on subjective qualifications even when a correlation exists between an employee's inability to meet those qualifications and his or her protected characteristic. *See Furr v. Seagate Technology, Inc.,* 82 F.3d 980, 987 (10th Cir.1996) ("Simply because there may be a correlation between age and potential does not mean that potential cannot be used as a selection criteria [for purposes of a reduction in force].") (reversing district court's denial of employer's motion for judgment as a matter of law). Thus, the court believes that the Tenth Circuit would conclude that an employer's decision to terminate a disabled employee in a reduction in force based on a *consequence* of the employee's disability is not, without more, actionable under the ADA.

■ Finally, Mr. Gazaway's comparison to Keith Delles is flawed. Mr. Delles was hired as a retail *service* representative. It is undisputed that Makita restructured its work force (*i.e.,* laid off sales representatives like Mr. Gazaway) in an effort to increase the number of retail service representatives. As a retail service representative, Mr. Delles was responsible for servicing home center stores (*e.g.,* Home Depot, Home Quarters, Sears) by setting displays, demonstrating products, and educating home center employees about Makita products. Sales representatives, on the other hand, are primarily responsible for selling and placing Makita products.[12]

---

12. Mr. Gazaway claims that Keith Delles had some sales responsibility in Kansas City. In support of this assertion, however, Mr. Gazaway cites to his deposition testimony "at p. *supra.*" The deposition excerpt cited prior to this reference does not reference Mr. Delles and the court is not willing to search the entire deposition transcript in an effort to find support for Mr. Gazaway's assertion. *See Gross v. Burggraf Construction Co.,* 53 F.3d 1531, 1546 (10th Cir.1995) ("Without a specific reference, we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury."). Mr. Gazaway also cites to the internal Makita memorandum which references an unnamed retail service representative who could "help out" Jack Haynes. This document does not suggest that Mr. Delles had sales responsibility in the Kansas City area.

In sum, Mr. Gazaway has failed to come forward with sufficient evidence that Makita's explanations for selecting Mr. Gazaway for layoff in the reduction in force are a mere pretext for discrimination. Thus, even if Mr. Gazaway could show that his post-traumatic stress disorder constituted a "disability" within the meaning of the ADA, Makita would still be entitled to summary judgment on his ADA claim. *See Randle v. City of Aurora*, 69 F.3d 441, 451 n. 14 (10th Cir. 1995) (explaining that "the defendant would ... be entitled to summary judgment if plaintiff could not offer evidence tending to show the defendant's innocent explanation for his employment decision was false.").

## IV. Outrage

Mr. Gazaway also alleges that Makita's conduct constitutes the tort of outrage. Makita contends that its behavior fails to constitute outrageous conduct under Kansas law. As set forth in more detail below, the court agrees with Makita and grants its motion for summary judgment on this claim.[13]

As this court has previously noted, Kansas has set a very high standard for the common law tort of outrage. *See Butler v. City of Prairie Village*, 974 F.Supp. 1386, 1406 (D.Kan.1997). Moreover, "Kansas courts have been reluctant to extend the outrage cause of action to discrimination and harassment claims." *Bolden v. PRC Inc.*, 43 F.3d 545, 554 (10th Cir.1994). To establish a prima facie case of outrage, plaintiff must show that (1) defendant's conduct was intentional or in reckless disregard of plaintiff; (2) defendant's conduct was extreme and outrageous; (3) there is a causal connection between defendant's conduct and plaintiff's mental distress; and (4) plaintiff's mental distress is extreme and severe. *Id.* at 553 (citing *Moore v. State Bank of Burden*, 240 Kan. 382, 388, 729 P.2d 1205 (1986)); *Butler*, 974 F.Supp. at 1406. The threshold inquiries for the tort of outrage are whether "(1) the defendant's conduct may reasonably be regarded as so extreme and outrageous as to

permit recovery and (2) the emotional distress suffered by the plaintiff is so extreme the law must intervene because no reasonable person would be expected to endure it." *Bolden*, 43 F.3d at 553 (citing *Roberts v. Saylor*, 230 Kan. 289, 292–93, 637 P.2d 1175 (1981)).

In support of his outrage claim against Makita, plaintiff alleges that Mr. Buck's forcing him to get back behind the wheel of a car within days of the accident and then forcing him to drive the same vehicle in which the accident occurred was outrageous conduct. The court believes that such conduct, particularly in light of the tragic circumstances in which Mr. Gazaway's claim arises, is certainly callous and unkind.[14] Although Makita's actions may be highly insensitive, they are not "so outrageous in character or so extreme in degree as to be beyond the bounds of decency or to be regarded as atrocious and utterly intolerable in a civilized society." *See Bolden*, 43 F.3d at 554 (citing *Roberts v. Saylor*, 230 Kan. 289, 293, 637 P.2d 1175 (1981)). Thus, the court concludes that Mr. Gazaway cannot maintain an outrage claim against Makita and grants Makita's motion for summary judgment.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Makita U.S.A., Inc.'s motion for summary judgment (doc. # 54) is **granted** and plaintiff's case is dismissed in its entirety.

**IT IS FURTHER ORDERED BY THE COURT THAT** defendant's motion to strike plaintiff's supplemental exhibits (doc. # 78) is **granted.**

**IT IS FURTHER ORDERED BY THE COURT THAT** plaintiff's certificate of receipt and motion for compliance (doc. # 74) is **denied as moot.**

**IT IS SO ORDERED.**

---

13. Makita also maintains that Mr. Gazaway's outrage claim is barred by his filing a workers' compensation claim under Missouri law. In light of the court's disposition on the merits of Mr. Gazaway's claim, however, it need not address this argument.

14. For whatever reason, Makita offers no explanation for insisting that Mr. Gazaway, despite his desperate protests, drive the van in which the accident occurred.